UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LONZO J. CLAY, ET AL.                    CIVIL ACTION


VERSUS                                   NO: 09-7625


HUNTINGTON INGALLS                       SECTION: "A" (2)
INCORPORATED


**ORDER AND REASONS**

Before the Court is a **Motion for an Order Permitting Court Supervised Notice to Employees of Their Opt-In Rights (Rec. Doc. 75)** filed by plaintiffs Lonzo J. Clay, Jean L. Guerrier, Randy James, and Kasandra Paul.  Defendant Huntington Ingalls, Inc.[1] opposes the motion.  The motion, taken under submission on June 20, 2011, with the filing of Plaintiffs' reply memorandum, is before the Court on the briefs without oral argument.  For the reasons that follow, the motion is DENIED.

**I. BACKGROUND**

_____

[1] Northrop Grumman Shipbuilding, Inc. was the original defendant in this lawsuit.  Northrop Grumman Corporation recently completed a spinoff of its shipbuilding business and a new publicly held corporation, Huntington Ingalls Industries, Inc., was established as sole owner of Northrop Grumman Shipbuilding, Inc.  Huntington Ingalls, Inc. owns the Pascagoula and Avondale shipyard facilities and employs the production employees who work there.  (Def. Oppo., Rec. Doc. 91-2, at 1 n.1).  Northrop Grumman Shipbuilding, Inc. formally changed its name to Huntington Ingalls Incorporated and on July 1, 2011, the Court granted Defendant's motion to substitute Ingalls Huntington, Inc. as defendant, and to change the case caption accordingly.  (Rec. Doc. 102).

1

This is a putative collective action against Huntington Ingalls, Inc. ("HII") seeking hourly and overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Plaintiffs are current and former hourly employees who worked at HII's facilities in Avondale, Louisiana and Pascagoula, Mississippi as non-exempt employees entitled to minimum wage, regular wage, and overtime pay.

The four named plaintiffs are employed as electricians at HII's facilities. The plaintiffs in this lawsuit claim that they were not fully compensated for their continuous workday activities during one or more weeks of their employment with HII. In particular, Plaintiffs contend that they are required to work off the clock for 1) pre-shift work consisting of gathering tools and donning additional PPE,[2] walking to their designated "muster" area and participating in pre-shift Take 5 meetings conducted by their supervisors; and 2) meal break work during periods when no food may be brought on board the vessel during certain phases of construction.[3] Plaintiffs are suing to recover unpaid wages, both straight time and over time compensation, for the period December 9, 2006, to the present. In addition to unpaid wages,

---

[2] **P**ersonal **P**rotective **E**quipment

[3] Initially Plaintiffs had also made a claim for post-shift work but after engaging in substantial discovery they have elected to forego that claim. (Pla. Reply, Rec. Doc. 98-2, at 2 n.3).

2

Plaintiffs are also seeking to recover liquidated damages,
attorney's fees, and costs associated with the litigation.[4]

The named plaintiffs contend that their claims are typical
of the claims of other former and current employees employed by
HII--that they are similarly situated to current and former
hourly paid workers who are or who have been employed at any time
from December 9, 2006, to the present at HII's Pascagoula and
Avondale facilities.[5]  Plaintiffs contend that their
declarations, deposition testimony, and the documentary evidence
show that they are similarly situated in that they are all
"victims of a particular alleged [policy or practice]."
Plaintiffs hope to proceed as an FLSA § 216(b) collective action
and via the instant motion they seek to have the Court 1) enter
an order identifying that this case will proceed as a collective
action (also known as certification), 2) order HII to produce a
computer readable data file containing the names, addresses, e-
mail addresses, social security numbers, and telephone numbers of
all current and former employees falling into the proposed class
of plaintiffs so that court-ordered notices may be implemented,

---

[4] Plaintiffs' claims are explained in much greater detail in
the Court's June 7, 2010, Order (Rec. Doc. 58) granting in part
and denying in part Defendant's Motion to Dismiss Certain Claims
With Prejudice (Rec. Doc. 38).

[5] The representative plaintiff class is potentially "all
current and former hourly production employees" employed by HII.
HII estimates that this could encompass as many as 14,000
individuals.

3) order HII to post on its company bulletin boards the court-approved notification to potential members of the collective action, and 4) order HII to refrain from interfering in any manner, whether written or unwritten, whether by act or omission, with the rights of its current and former employees to choose to "opt-in" as a plaintiff in this lawsuit.

Plaintiffs filed the instant motion for court-supervised notice on October 25, 2010.  Plaintiffs sought the foregoing items 1) through 4) of requested relief based solely on their own declarations and the allegations of their complaint, as is typical with such motions as they are usually filed before the commencement of discovery.  Defendants then sought leave of court to conduct discovery pertaining to the certification issue, which the Court allowed over Plaintiffs' objection.[6]  Defendants filed their opposition on April 21, 2011, and Plaintiffs filed their reply on June 20, 2011.[7]

## II.   CERTIFICATION OF FLSA COLLECTIVE ACTIONS

Section 216(b) of the FSLA provides in relevant part that

---

[6] The Court allowed the discovery subject to Defendant agreeing to the tolling of the statute of limitations from November 30, 2010, through the date that Defendant filed its opposition.  (Rec. Doc. 85).

[7] The Court also allowed HII to file a sur-reply memorandum even though Plaintiffs alone bear the burden of establishing that certification is appropriate.  With the benefit of discovery Plaintiffs' reply was more tailored to the facts of this case than their original motion so the Court allowed HII to respond.

4

"[a]ny employer who violates the provisions of [the FLSA] shall be liable to the employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in the additional equal amount of liquidated damages."  29 U.S.C.A. § 216(b) (West 1998 & Supp. 2011).  An action seeking such relief may be maintained against the employer "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  Id.  Such an action is referred to as a *collective* action.  But "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  Id.

The FLSA does not define the term "similarly situated" and it does not dictate the manner in which collective actions are to proceed.  But it is now well-settled that district courts exercise vast discretion when deciding whether to certify an FLSA case as a collective action.  In determining whether to exercise this discretion courts in this circuit typically employ a two-stage process.

First, the plaintiff moves for conditional certification of his collective action.  Sandoz v. Cingular Wireless, LLC, 553 F.3d 913, 916 n.2 (5th Cir. 2008) (citing Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1213-14 (5th Cir. 1995)).  For purposes of § 216(b) of the FLSA, the term "certification" really refers to the

process by which the court facilitates notice to potential plaintiffs of the pendency of the action and of their opportunity to opt-in.  <u>Meyers v. Hertz Corp.</u>, 624 F.3d 537, 554 (2nd Cir. 2010) (<u>quoting</u> <u>Hoffman-La Roche, Inc. v. Sperling</u>, 493 U.S. 165, 169 (1989)).  At this first stage, which is typically referred to as the notice stage, the district court decides, usually based on the pleadings and affidavits of the parties, whether to provide notice to fellow employees who may be similarly situated to the named plaintiff, thereby conditionally certifying the collective action.  <u>Id.</u>  The determination at the notice stage is made using a fairly lenient standard because the motion to certify typically comes relatively early in the litigation when the court has minimal evidence before it.  Certification is by no means automatic but at this stage it is probable.  <u>Lima v. Int'l Catastrophe Solutions, Inc.</u>, 493 F. Supp. 2d 793, 797-98 (E.D. La. 2007) (Fallon, J.) (<u>citing</u> <u>Mooney</u>, 54 F.3d at 1213-14).

Assuming that the court agrees to conditionally certify the case as a collective action, thereby entering the notice stage, the second stage, referred to as decertification, is triggered when the defendant files a motion for decertification following discovery.  <u>Id.</u>  At this stage the court must make a factual determination as to whether there are similarly-situated employees who have opted in.  <u>Sandoz</u>, 553 F.3d at 916 n.2 (<u>citing</u> <u>Mooney</u>, 54 F.3d at 1213-14.  If so, the collective action may

proceed, and if not, the court must dismiss the opt-in employees, leaving only the named plaintiffs' original claims.  Id.

Sometimes, as in the instant case, the parties will have engaged in discovery, perhaps limited or perhaps extensive, and so the standard for certification at the notice stage will appropriately be less lenient.  See McKnight v. D. Houston, Inc., 756 F. Supp. 2d 794, 802 (S.D. Tex. 2010).  But the fact that some discovery has been conducted does not increase the plaintiffs' burden at the conditional certification stage to the more onerous standard that applies at the second, decertification stage.  Id.  That standard is only appropriate after discovery is largely complete and the case is ready for trial.  Id. (quoting Mooney, 54 F.3d at 1214).

Neither stage of certification is an opportunity for the court to assess the merits of the FLSA claims themselves by deciding factual disputes or making credibility determinations. McKnight, 756 F. Supp. 2d at 802.  And it is not appropriate at the notice stage to make the plaintiffs present evidence that would be required to survive a motion for summary judgment.  Id. at 803 (citing Bouaphakeo v. Tyson Foods, Inc., 564 F. Supp. 2d 870, 893 (N.D. Iowa 2008)).

When deciding whether claims should proceed as a collective action the court must be mindful of the purposes and goals of the FLSA.  Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1264-

65 (11th Cir. 2008).  Two key purposes of the Act are reducing the burden on plaintiffs through the pooling of resources and efficiently resolving common issues of law and fact that arise from the same illegal conduct.  <u>Id.</u> (citing <u>Hoffman-La Roche</u>, 493 U.S. at 170).  The FLSA is a remedial statute that should be liberally construed.  <u>Id.</u> (citing <u>Prickett v. DeKalb County</u>, 349 F.3d 1294, 1296 (11th Cir. 2003)).  Because judicial efficiency is one of the key purposes of the collective action, at the notice stage there must be a showing of "some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency." <u>McKnight v. D. Houston, Inc.</u>, 756 F. Supp. 2d 794, 801 (S.D. Tex. 2010) (quoting <u>Barron v. Henry Cnty. Sch. Sys.</u>, 242 F. supp. 2d 1096, 1103 (M.D. Ala. 2003)).  Courts have refused to permit FLSA suits to proceed as collective actions if the individualized inquiries required would eliminate "the economy of scale envisioned by the FLSA collective action procedure." <u>Id.</u> (quoting <u>Holt v. Rite Aid Corp.</u>, 333 F. Supp. 2d 1265, 1275 (M.D. Ala. 2004)).  Because judicial economy is a goal, the size of the FLSA collective action is generally not a factor that militates against certification.  <u>Morgan</u>, 551 F.3d at 1265.

It also bears noting that the term "certification" in the context of an FLSA collective action is a wholly distinct concept from the term "certification" as used with a Rule 23 class

action.  Certification for purposes of an FLSA collective action refers only to the district court's exercise of its discretionary power to facilitate the sending of notice to potential class members.  Meyers v. Hertz Corp., 624 F.3d 537, 555 n.10 (2nd Cir. 2010).  Unlike a Rule 23 class, certification of a collective action does not create a class of plaintiffs and it does not add plaintiffs to the case because § 216(b) expressly requires that each and every plaintiff affirmatively opt into the case in order to pursue his claims and obtain recovery.  In fact, even in the absence of a certification order plaintiffs remain free to opt-in on their own so long as they are similarly situated to the named individual who brought the action.[8]  Id. (citing Morgan, 551 F. 3d at 1259).

    And in stark contrast to Rule 23 class actions, a district court's decision to certify a collective action does bind other class members as it does with Rule 23.  Morgan, 551 F.3d at 1259 n.36 (citing Cameron-Grant v. Maxim healthcare Servs., Inc., 347 F.3d 1240, 1249 (11th Cir. 2003)).  For this reason the stringent rules for certification that apply to Rule 23 classes do not apply to collective actions.  And unlike a court's ruling to certify (or refuse to certify) a Rule 23 class, neither party has a mechanism to seek an immediate appeal of a district court's

---

    [8] Of course, once it becomes clear that the case will not proceed as a collective action then the normal joinder rules of Federal Rule of Civil Procedure 20(a)(1) will apply.

order either certifying a collective action or refusing to do so.

One might reasonably conclude that the ability to appeal a conditional certification order is obviated by the prospect of decertification at stage two, which allows the district court to vacate any conditional certification orders that hindsight and evidence might reveal to have been improvidently granted.  In other words, some courts might be particularly permissive at the notice stage in light of the fact that the defendant will later file (in all likelihood) a motion to decertify thereby allowing the court to revisit the issue of certification in a no harm/no foul manner.  Of course as employers are wont to point out, and as HII has done in this case, conditional certification can bring consequences that decertification will not necessarily undo. (HII Oppo., Rec. Doc. 91-2, at 40-41).[9]

In fact, legal commentators have recognized that a decision to certify, even if subject to correction at the decertification stage, is not without consequences.  Giving too lenient an approach at the notice stage can lead to an employer being

_____

[9] For instance in this case, HII points out that in all likelihood a sizeable percentage of the nearly 14,000 former and current employees who would receive notice would likely join the suit with hopes of a windfall recovery.  The enormous burden and expense of conducting discovery with respect to potentially thousands of plaintiffs could not be recouped even if the Court were to eventually decertify the action.  Finally, even in the event of decertification the notice/opt-in procedure could be used by plaintiff's attorneys to "shop" for clients for whom they will later file individual lawsuits.  (HII Oppo., Rec. Doc. 91-2, at 40-41)

burdened by something that may be no more than a "frivolous
fishing expedition conducted by the plaintiff at the employer's
expense." Lima, 493 F. Supp. 2d at 799 (quoting Lentz v.
Spanky's Restaurant II, Inc., 491 F. Supp. 2d 663, 669 (N.D. Tex.
2007)).  Courts, like practicing attorneys, should refrain from
stirring up  unwarranted litigation.  Id.  Certification is a
tremendous strategic advantage to  plaintiffs because it greatly
reduces their transaction costs and notice serves as a low-cost
vehicle to identify persons who are likely to have case-related
information and who are motivated to work with plaintiffs'
counsel as witnesses.  Matthew W. Lampe & E. Michael Rossman,
Procedural Approaches for Countering the Dual-Filed FLSA
Collective Action and State-Law Wage Class Action, 20 Lab. Law.
311, 315 (2005) (citing Zhao v. Benihana, Inc., 6 Wage & Hour
Cases 2d (BNA) 1881 (S.D.N.Y. May 7, 2001)).  Notice can also
create settlement pressure early in the action, before
plaintiffs' counsel expends significant resources, because it
signals the potential expansion of the case and the need for
significant and expensive class-wide discovery.  Id.  And if a
court is especially lenient at the notice stage then
certification may leverage significant settlements even in
marginal cases.  Id.

**III. <u>DISCUSSION</u>**

        This Court agrees with those district courts that have

concluded that a more demanding analysis of the certification
issue is appropriate in light of the substantial discovery that
has taken place in this case.  The question of how much more
demanding that analysis should be is unanswered.

Further, because judicial economy is an overriding concern
of the FLSA collection action proceeding, this Court is persuaded
that the concept of "similarly situated," which the statute does
not define, necessarily encompasses the notion that certain
aspects of the case must be triable in a representative fashion
that does not eviscerate the defendant's right to effectively
defend the claims on the merits.  The collective action mechanism
of the FLSA serves no utility if thousands of plaintiffs join
together in one lawsuit only to then try their claims
individually.  The Court does not agree with Plaintiffs'
contention that the Court should simply ignore the fact that
certain individualized defenses might apply and postpone the
issue until decertification.  (Pla. mtn at 2 n.1).  A substantial
amount of discovery has already been conducted in this case and
if that discovery tends to show that trying the claims in a
representative fashion is not practicable, then the Court can
appropriately consider that as a factor when exercising its
discretion to certify the action.  The Court is not inclined to
believe that the correct course of action is to blithely certify
the action with a blind eye toward deficiencies that discovery

12

has already revealed.

Finally, this Court does not view conditional certification as a mere temporary ruling that carries no real consequences in light of the potential for decertification.  Via the conditional certification process Plaintiffs are asking this federal court to put its imprimatur on their claims.  The Court must therefore satisfy itself that opening this lawsuit up to 14,000 individuals is not only practicable but compatible with the goals of the FLSA.

With this backdrop in mind the Court turns its attention to the specific claims at issue in this case.

### A.   *Plaintiffs' Pre-Shift Work Claims*

Plaintiffs' pre-shift work claims are centered on the assertion that they are required to gather tools and don additional safety equipment, walk to their designated "muster" areas, and participate in Take 5 meetings conducted by their supervisors, all off the clock prior to the start of their shifts, and therefore without compensation.  Plaintiffs contend that the factual nexus that binds their claims together is that they are all victims of the same unlawful policy or practice. The specific common policy or practice that Plaintiffs identify is HII's requirement that all of its hourly employees perform work "off the clock" before their shift begins.  (Pla. Reply, Rec. Doc. 98-2, at 6).  Plaintiffs contend that they have in fact

shown a company-wide policy because HII has an established
uniform timekeeping and pay system that does not capture the time
that employees spend working off-the-clock.  (Id. at n.9).  And
because the common policy at issue is "off the clock work," the
fact that class members might hold a variety of jobs under a
variety of supervisors or work in different shipyards and on
different ships and jobs is of no moment.  (Id.).

    Plaintiffs correctly note that their pre-shift work claim is
based on the "continuous workday" rule, which requires payment
for all time spent from the first to the last acts each day that
are "integral and indispensable" to the employee's principal
activity.  (Pla. Reply, Rec. Doc. 98-2, at 27).  Pursuant to the
continuous workday rule, any activity, whether it be walking or
waiting or tool gathering or whatever, must be compensated if it
occurs *after* the employee's first principal activity and *before*
the employee's last principal activity (meal break excluded).
Via its ruling granting in part Defendant's motion to dismiss,
the Court eliminated from consideration certain activities that
Plaintiffs had hoped to have recognized as their first principal
activity, i.e., badge swiping, walking, and donning non-unique
PPE, but left open the fact-driven question of which specific
*other* activity constituted Plaintiffs' first principal activity.
(Rec. Doc. 38).  That question remains open and the Court has no
intention of attempting to resolve it now in the context of a

14

motion to certify.  That said, Plaintiffs' pre-shift claims are implicitly grounded on the contention that their first principal activity is either gathering tools, gathering/donning additional PPE, or participating in mandatory Take 5 meetings, all of which they claim occurs prior to the start of their paid shift.

### *Take 5 Meetings*

The issue of Take 5 meetings is a good starting point for the Court's analysis of the pre-shift claim because no plausible argument can be made disputing the contention that participation in Take 5 meetings is "work" for which Plaintiffs must be compensated.[10]  Therefore, if HII requires its employees to be present prior to the start of the shift for Take 5 meetings then this activity constitutes a principal activity for which Plaintiffs must be compensated, and which triggers the start of the continuous workday (pretermitting for now consideration of whether some other activity that occurs prior to the Take 5

---

[10] "Take Five" is a pre-job safety and health inspection intended to ensure that employees are suitably equipped for work and that jobsites are free of recognized safety hazards. (Employee Environmental, Health, and Safety Handbook, Pla. Exh. 14, at 10).  HII requires all of its hourly workers to participate in Take 5 meetings.  (Id.).  At the meeting the foreman gives out work assignments and inspects the crew for proper safety equipment, tools, etc. to make sure that the day's work goes smoothly and efficiently.  The foreman completes a checklist sheet and the employees sign off on an attached signature sheet.  (Pla. Exh. 2).  Take 5 meetings are clearly an activity performed for the employer's benefit and they are clearly an activity integral to Plaintiffs' principal activity. Thus, if they occur pre-shift then they start the beginning of the continuous workday.

meeting might be a principal activity).

In their declarations the named plaintiffs stated that HII requires that its employees participate in mandatory meetings before the start of the shift.  (Pla. mtn, Rec. Doc. 75, Exh. D (Paul); Exh. E (James); Exh. F (Clay)).  Whether those meetings in fact occur pre-job (and by implication on-the-clock) as indicated in the handbook or pre-shift, as claimed by Plaintiffs and indicated in Defendant's own newsletter (Pla. Exh. 3), is a contested issue of fact.

Named plaintiff Lonzo Clay's shift begins at 6:00 a.m.  Clay testified that he had to be at the muster area[11] for Take 5 meetings by five minutes to 6:00 when the pre-shift horn sounds. (Pla. Exh. 4, Depo at 16-17, 19, 134).  According to Clay some people would arrive after the five-minute period and the foreman would tell them that they were late.  (Id. at 56).  Work assignments were given out at the Take 5 meetings so that the workers could head directly to their work areas when the 6:00 a.m. whistle blew.  (Id. at 62, 125).

Named plaintiff Randy James's shift starts at 2:30 p.m. James testified that Take 5 meetings "sometimes" occur between 2:25 and 2:30.  (Pla. Exh. 7, Depo at 67, 84).  According to

---

[11] The muster area is the term used at HII's facilities to denote the designated meeting place for employees to meet with their supervisors prior to heading to the designated work area for the day.

James he would have to be at the meeting area by 2:25 or 2:27 in order to avoid getting docked. (Id. at 70). James was adamant that he had to be present before 2:30 in order to avoid being reprimanded for being late. (Id. at 73). James testified that whether the meeting begins pre-shift will sometimes depend on the individual supervisor. (Id. at 178).

Named plaintiff Kasandra Paul's shift starts at 6:00 a.m. Paul was adamant that her supervisors required that she and her crew be present at five minutes to 6:00 for Take 5 meetings. (Pla. Exh. 6, Depo at 67, 74, 78, 79, 90, 96, 98). Paul testified that employees were given a verbal warning if they reported after that time.

Named plaintiff Jean Guerrier[12] testified at several points during his deposition that his supervisors required the crew to be present prior to the start of the shift for Take 5 meetings. (Pla. Exh. 5, Depo at 28, 31). But elsewhere in his deposition, Guerrier answered that he was not late so long as he was present at the shift start time. (Depo at 27, 29-30, 32).

Plaintiffs also submit the declarations of Jeffery Richardson (Pla. Exh. 8) and Rodney Thompson (Pla. Exh. 9) in support of their contention that Take 5 meetings occur pre-shift.

---

[12] Named plaintiff Jean Guerrier did not submit a declaration in support of certification. At his deposition he indicated that he wanted to withdraw his claim in the lawsuit. (Depo at 6). To the Court's knowledge Guerrier has not formally moved to withdraw his claim.

HII has submitted its own evidence to counter Plaintiffs'
submissions.  Kelly Crawford is employed as an electrical foreman
at HII and she denies that Take 5 meetings occur prior to 6:00
a.m.  (Crawfrod Decl., Def. Exh. 15).  Crawford even states that
she worked in the same crew with named plaintiff Randy James and
that they were never required to be in the muster area before
6:00 a.m.  (<u>Id.</u>).  HII has obtained declarations from Josue Diaz,
Ray Garrett, Steve Terry, Jr., and Randy Zinz who all make
assertions similar to Crawford's.[13]

The crux of HII's argument with respect to the issue of Take
5 meetings is that Plaintiffs' contention that they occur pre-
shift is simply not credible, false, and that HII's evidence
demonstrates that there is unquestionably no policy of general
application requiring employees to arrive pre-shift for Take 5
meetings.  But the Court cannot simply reject the credibility of
some plaintiffs and decide that they lied under oath.  In other
words, the Court cannot credit the testimony of HII's witnesses
while simply rejecting that of Plaintiffs.  And contrary to
Plaintiffs' suggestion, the Court need not give more credibility
to their assertions than to the conflicting assertions made by
many of HII's witnesses.

In fact, this Court has no reason to doubt the veracity of

---

[13] HII also submits deposition excerpts from Robert M.
Torelli (Def. Exh. 20) and Jimmy Richardson (Def. Exh. 24) in
support of its position.

18

those plaintiffs who contend that they are required to attend Take 5 meetings pre-shift.[14]  But the fact that this type of FLSA violation occurs is not determinative of whether this claim is appropriate for certification.  Certification is only appropriate if the violations that are supported by the evidence occur due to a general or common policy that affects all potential class members.  And the conflicting evidence surrounding the Take 5 meetings does not necessarily mean that the meetings do not occur pre-shift as HII contends.  Rather, the evidence suggests that when they do occur pre-shift they do not do so as part of a common policy or plan.  Of course the more that the Take 5 meeting policy strays from being one of general application the less those individuals affected become similarly situated victims of a common policy or practice.  And without a common policy or practice underlying the claims, a representative action cannot be maintained.  The Court therefore declines to certify this aspect of Plaintiffs' pre-shift claim for collective treatment.[15]

---

[14] Both the questioning at Plaintiffs' depositions and Defendant's briefing suggests that there is little evidence, at least at this juncture, that any of the plaintiffs were actually docked for failing to report to their muster areas before the shift start time.  But some of the plaintiffs testified that they were given reprimands and threatened with docking if they did not report early.  The question then is whether there was no evidence of docking because the Take 5 pre-shift policy does not exist or because Plaintiffs were simply compliant most of the time in light of the threats.

[15] The Court is not moved by Plaintiffs' contention that the number of opt-ins to date (355 as of 10/25/10 according to

### *Tool Gathering, Donning Additional PPE, and Walking*

Gathering/donning additional PPE and tool gathering present an even more difficult situation because those activities may or may not be compensable and may or may not constitute principal activities.  The law is clear that donning non-unique PPE and simply gathering a tool bag are not compensable yet the law is also clear that there are certain types of unique, burdensome PPE whose donning will not only be compensable but will also trigger the start of the workday.  The same holds true with the gathering of certain types of tools.  The question of whether these types of activities are integral and indispensable to a principal activity is necessarily going to be very fact-driven.[16]

The one thing than can undisputedly be said about donning additional PPE and gathering tools is that those activities are necessary for the employees to engage in their principal

─────────────────

Plaintiffs), (Pla. mtn, at 17 ¶ 26), is somehow probative of whether Plaintiffs have made the necessary showing to obtain conditional certification.  An individual's willingness to join a lawsuit that will in all likelihood demand very little of him/her yet might ultimately result in financial recovery does not suggest that certification is appropriate.

[16] The Court will accept Plaintiffs' assertion, that they base on <u>Alvarez</u>, that a non-compensable activity might nevertheless be a principal activity for purposes of the continuous workday rule.  (Pla. Reply, Rec. Doc. 98-2, at 26).  Of course, <u>Alvarez</u> leaves no doubt that the converse proposition is true:  Any activity that is compensable will be a principal activity for purposes of the continuous workday rule.  <u>IBP, Inc. v. Alvarez</u>, 546 U.S. 21, 32 (2005).

activities.  But the fact that an employee must engage in a certain activity in order to perform his principal activity does not mean that the activity is integral and indispensable to a principal activity for purposes of the continuous workday rule. <u>Alvarez</u>, 546 U.S. at 40-41.

Of course, walking will never be a principal activity for purposes of the continuous workday rule in light of the Portal to Portal Act.  Therefore, the walking at issue here only matters insofar as it is compensable and it only becomes compensable when it occurs after a principal activity.

The named plaintiffs' declarations are rather sparse with respect to the claim for pre-shift donning of additional PPE and tool gathering but the general consensus seems to be that additional items beyond core PPE are sometimes required by HII depending on the specific job.  The declarants do not, however, specifically describe the additional PPE that they are referring to.[17]  (Pla. mtn, Rec. Doc. 75, Exh. D (Paul); Exh. E (James); Exh. F (Clay)).  The issue of gathering tools pre-shift is not expounded upon in their declarations.

Lonzo Clay testified that in addition to his core PPE, sometimes he has to wear a respirator if he will be working in a smokey area and on occasion he must use a safety harness and a

---

[17] The declarants do enumerate some PPE items but most of those items are the non-unique PPE that the Court addressed in detail in its ruling on Defendants' motion to dismiss.

21

face shield.  (Pla. Exh. 4, Depo at 30, 47, 132).  Whether he
would need any of this additional equipment depends on the work
assignment for the given day and Clay could not say how often
those items were needed.  (Id. at 30, 32).  Whether the equipment
is obtained pre-shift or during the shift depends on the
particular work assignment, and some equipment is only available
from the tool shed which does not open until 6:00 a.m.  (Id. at
135).  Some PPE items are available at the site's safety store
and whether you can go there during the shift depends on the
particular foreman.  (Id. at 137).

     Clay testified that he retrieves his tools from a bag that
he keeps in his locker/toolbox before heading to the muster area
for the Take 5 meeting.  (Id. at 38).  On occasion Clay had to
gather cumbersome equipment like a hydraulic crimping machine.
(Id. at 41-42).  How often that occurred just depended on the
particular job.  (Id. at 46-47).

     Randy James testified that in addition to his core PPE,
sometimes he has to use a safety harness or a sock or a face
shield depending on the job.  (Pla. Exh. 7, Depo at 38, 40, 153).
James testified that he gathers his tools for the day pre-shift.
(Id. at 78-79).  Usually his tools consist of his personal tool
belt.  (Id. at 79, 83).  According to James he had to have his
tools with him at the Take 5 meeting.  (Id. at 194).  Sometimes
James had to use grinders for a job and sometimes he would get

22

them before the Take 5 meeting and sometimes after.  (Id. at 155-56).

Kasandra Paul testified that in addition to her core PPE she would sometimes use a safety harness, respirator, or face shield. (Pla. Exh. 6, Depo at 26).  Paul stated that she was expected to have all of her equipment with her when she reported to the worksite and about 30 times she had to get a harness from the tool room pre-shift.  (Id. at 33-34).  Paul was not sure how many times she had had to get a face shield pre-shift but she estimated it at about 10 or 15 times.  (Id. at 42).  Sometimes Paul needed a respirator or insulated arm shields (3 times in 3 years) and whether she could get those items during her shift or pre-shift would depend on when she found out that she needed them.  (Id. at 44).

Paul testified that whether and how often she had to get tools from the tool room pre-shift just depended on the job for that day.  (Id. at 72).  And sometimes the tools were in the gang box next to the sign-in area and sometimes they were in the tool room.  (Id. at 50, 72).

Jean Guerrier testified that his core PPE (safety glasses, earplugs, hard hat, and steel-toed shoes) was the only safety equipment that he wore for his job assignments.  (Pla. Exh. 5, Depo at 68).  The personal tools that he is required to have are a meter, tester, screwdriver, cutter, snips, and a bunch of other

tools and when they are not being used they are kept in a gang box. (Id. at 10).  The type of tools needed for the day depends on the particular job assignment but Guerrier picks up his tool bag from the gang box before walking to the ship for muster. (Id. at 24, 53).  But generally the tools that Guerrier gathers before heading to the ship are his personal tools.  (Id. at 69).

HII's Take 5 For Safety checklist sheet indicates that the foreman checks for safety equipment, including non-core PPE, and personal tools during the Take 5 meeting.  (Pla. Exh. 2).  HII's company policy is that "[e]mployees should come to work ready to work at the beginning of the shift."  (Pla. Exh. 1, at ¶ 3).

The gathering and donning of additional company-owned safety equipment such as a harness and the gathering of more cumbersome company-owned tools like a hydraulic crimping machine may very well be principal activities that would trigger the start of the continuous workday if employees currently perform these tasks pre-shift and off the clock.  The Court has no reason to doubt the veracity of those plaintiffs who attest to having on occasion performed those tasks off the clock and so there very well could be FLSA violations occurring.  But the evidence persuades the Court that the occurrence of any violations is too sporadic and irregular to support certification.  Not every employee gathers additional PPE and tools and none of the plaintiffs could really describe with any certainty how often they were required to do

so, much less how often they were required to do so pre-shift.
Differences in the specific job assignments and the timing of the
job assignments affect this claim because sometimes employees are
told during the shift that they will need additional PPE or
tools.  And some supervisors allow employees to obtain additional
PPE and tools after job assignments are given out at the Take 5
meeting.  Thus, differences in the way that the various
supervisors run their shifts affects this claim.  And not every
additional tool or extra article of PPE that one gathers or dons
is necessarily going to constitute a principal activity.  For any
given plaintiff asserting this particular pre-shift claim, there
must be an individual determination of the first principal
activity for any given workday as it could change day to day.
The circumstances under which a violation would actually occur
and liability would attach are just too individualized for this
claim to be tried in a representative fashion.

Regarding the gathering of personal tools, this activity may
or may not constitute a first principal activity of the day.
Gathering tools is certainly necessary for the plaintiffs to
engage in their primary principal activity but the law is clear
that this is not enough to render an activity integral and
indispensable to a principal activity.  Whether the activity of
gathering tools pre-shift is compensable, and therefore ipso
facto a principal activity, or non-compensable but nonetheless a

principal activity, see note 16 supra, is necessarily going to depend upon the very fact-intensive and individualized question of the nature of the tools that the employee gathers on any given day.  For instance, the Court is certain that under the law as it stands today, the act of merely retrieving and toting a pair of pliers and a screwdriver is not going to trigger the start of the continuous workday.  On the other hand, the tasks of gathering and then lugging certain type of tools needed for a particular day's work assignment might very well trigger the start of the workday when it is done pre-shift.  But again, the circumstances under which a violation would actually occur and liability would attach are just too individualized for this claim to be tried in a representative fashion.

**B.  *Plaintiffs' Meal Break Claims***

Plaintiffs meal break claim is limited to restricted periods of time when HII prohibits eating on the vessel and forces the employees to leave the ship to eat.  This occurs during the latter part of construction as the ship nears completion and the Navy requires that HII enforce this rule.  Plaintiffs complain that they cannot leave the ship until the lunch whistle sounds and that they must gather and store tools, clean up their work area, and exit the ship before they can even begin to eat lunch. According to Plaintiffs, depending on the location of the employee, it could take 3 to 10 minutes to exit the ship.

Employees are then required to return to their work stations with their tools and be ready to work before the lunch period is over. Thus, the work that Plaintiffs contend that they do during their unpaid lunch break is: cleaning and securing their work area, stowing their tools, and exiting the ship after the lunch whistle blows and then returning to the ship and their work areas to gather their tools and be ready to immediately begin working when the lunch break ends.

In its prior Order and Reasons the Court expressed skepticism at certain aspects of Plaintiffs' meal break claim such as Plaintiffs' contention that the time they spend walking to exit the ship once they are relieved of their work duties somehow constitutes compensable "work." Even if the walking does constitute work, the time spent doing this activity varies greatly from day to day, during those times when employees cannot eat on the ship. Similarly, every hourly employee in this country must allocate some portion of his lunch period to begin returning to his work area so as to be there when the lunch hour ends. In other words, in virtually every hourly scenario imaginable, the employee is expected to be back at his desk or work area and ready to resume his work when the lunch period ends.

When the Court last addressed the meal break issue Plaintiffs had complained about time spent doffing and re-donning

27

PPE during their unpaid break.  Three of the named plaintiffs
signed a declaration to this effect.  However, their depositions
revealed that none of the plaintiffs don and doff PPE during
their meal break.[18]

Requiring employees to clean and secure work areas would be
"work," even though it may or may not involve more than a de
minimis amount of time, and therefore requiring Plaintiffs to do
this during their unpaid break could be problematic.  But while
the policy that forces the employees to leave the ship at lunch
break is clearly company-wide, it is not equally applicable to
all members of the potential class.  In other words, it does not
affect all employees and those that are affected are only
affected sometimes.  Named plaintiff Clay did not even know how
much of the time in the last three years he would have been
affected by this policy.  (Pla. Exh. 4, Depo at 75).  And even
where employees are affected there is no compensation owed if the
employee chooses to stop a few minutes early to begin cleaning up
or just starts walking when the whistle blows because the amount
of time involved is so de minimis.  (James depo at 167-68;
Richardson depo at 57-58; Blades depo at 76; Richburg depo at

---

[18] The Court finds it disturbing that three of the four
named plaintiffs signed declarations that contained a glaringly
factual inaccuracy regarding the doffing and re-donning of PPE
during lunch.  This occurrence just reinforces the Court's belief
that discovery was appropriate to flush out the exact nature of
Plaintiffs' claims before moving full speed ahead to certify a
collective action with potentially 14,000 plaintiffs.

28

58).  Thus, while the meal break claims involve an undisputed company-wide policy, the policy does not affect all employees all the time and the issue of liability for an FLSA violation will necessarily have to be determined on a case by case basis.  The Court is not persuaded that Plaintiffs' meal break claim is appropriate for certification.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for an Order Permitting Court Supervised Notice to Employees of Their Opt-In Rights (Rec. Doc. 75)** filed by plaintiffs Lonzo J. Clay, Jean L. Guerrier, Randy James, and Kasandra Paul is **DENIED**.

September 29, 2011

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE

29